Okay, go ahead. Good morning, and may it please the Court. My name is Jeff Bielert. I'm here on behalf of the Federal Appellants. I am joined by Mark Sturmitz for the Intervenor Water Districts. I'd like to take ten minutes. I'd like to give five minutes to Mr. Sturmitz and then reserve five minutes for rebuttal. Well, I'm going to tell you that's fine, but I'll be fair. You're going to have to protect him, because we're not going to protect him. And, I mean, we'll try our best to be fair, but when you divide your argument up, it makes it tough. I understand, Your Honor. We're here today in review of a preliminary injunction entered by the District Court granting the extraordinary relief to plaintiffs who seek to prevent federal agencies from improving the status of an endangered fish. This is a strange case, and I was trying to find others. Normally, we have a federal action that's taken for some other purpose, and we try to look at its effect on endangered species. Is there any case that you're aware of that involves the Federal Government undertaking remedial action and the challenge being that it's not sufficient? Not exactly on point, no, Your Honor. I think this is absolutely a unique case. What you have in this case is not Federal agency action. They're seeking to mitigate the harm. What you have is an existing weir that all the parties, including the District Court, recognize that the existing weir prevents these fish from swimming upstream. Yes. So I'm trying, in looking at the case law, and I want to ask your colleagues the same question, I'm trying to find a case where the government says we recognize that we have an endangered species, we want to make the situation better, and the argument on the other side is, well, you really haven't made it better or you haven't made it good enough. Is there any, where would I look for authority on that point? That's my point, Your Honor. I think that this is a unique case. The cases that we cite in our brief, I mean, winter itself, talking about Boardman was a decision by this Court. But what I think you have to start with is what is the situation and what are we seeking to do? And in this case, plaintiffs are seeking and sought and received an injunction that prevents this project from going forward. So you have to look at, and this is what the District Court failed to do, you have to look at what is the action that's being taken. And it's unequivocal, unequivocal on this record, that the action that's being taken is improving the situation. On this record, let's assume the government had decided instead not to do anything. Would that be a violation of any federal law? So that's the thing, Your Honor. Well, I know it's the thing. No, but look, the Corps of Engineers can walk away from this project. I mean, the bottom line is the Bureau of Reclamation and the water districts, Congress passed a law in 1905, it created this weir. It created a weir that's going to irrigate 58,000 acres of farmland. And no, the Corps of Engineers is not required to take the actions that it has decided to take in this case. This was whenever the weir was built, whenever Congress did it. At that point, had the Endangered Species Act. No, the Endangered Species Act wasn't enacted until 1906. I know, but at that point, there would have been a requirement to, it had the act been in effect, to go through the processes of the act, right? No, I don't think so, Your Honor. And I think that you can look at the TVA v. Hill case. The Endangered Species Act is not a retroactive statute. No, no. I'm sorry. We're speaking past each other. If the act had been in existence at the time the dam was built. Oh, the Endangered Species Act. I'm sorry. I misunderstood, Your Honor. Yes. Then there would have been a requirement of consultation and minimization, et cetera. Of course. Yes. So if the Endangered Species Act had existed as of 1901, and Congress reported this money and said, we're going to create a dam, then yes. But your position is that because the weir is existing. The weir is an existing. Correct. Any governmental action has to make things worse. Is that your? In order to sustain an injunction, to create irreparable harm, it has to make the situation worse. And so our. As far as making it worse, the fact that there's a period of, what, two to three years where the salmon wouldn't be able to return or go upstream, would that have been a basis for the Court to find that, in fact, we had a worsening? Well, first of all, Your Honor, that argument was not made before the district court. Plaintiffs never suggested that the interim two- or three-year period somehow created irreparable harm. That first appeared in their appellate brief. But to answer your question, Your Honor, no. And here's why. We talk about this in our brief. It's too speculative. So the existing high water side channel, the existing channel, it only passes fish seven to ten days every year that there's high water. And the high water has occurred, historically, every five out of ten years. So it's way too speculative to somehow suggest that this high water event is going to occur between March and July, the spawning season for the pallid sturgeon. There's going to occur this in 2018, because plaintiffs themselves tell the Court that the district court's going to resolve this case by mid-2018. So you have to have that harm occurring during that time. But it's not just that, Your Honor. It's not just that it's too speculative. It's that the Federal agency specifically recognized that there may be fish that are seeking to spawn, seeking to swim upriver. And what the Federal agencies have done here is they've come up with a catch-and-haul program. So if there is a fish that shows up and tries to seek to swim upstream, the government's going to catch this fish and carry it upstream and allow it to continue swimming. Was there a challenge of that, that it was too unclear and lacking specificity as to exactly how this was going to take place? That's plaintiff's view. But, I mean, the government, it's in the excerpts of record. You only need to look at the Fish and Wildlife Service's expert biological opinion. It talks about this. It's also talked about in the environmental impact statement. And it talks specifically about this program and actions that the Federal government will take to minimize any harm to these fish during the construction period. But it's also important to recognize that it's not just this interim period. What we're looking at is the long-term solution here for these fish. And what the Fish and Wildlife Service in its expert biological opinion concluded is when this project is completed, what you'll have is a permanent opportunity for fish to pass. And when it looked at this, it looked at the existing side channel. The existing side channel is available infrequently. Now I understand here on appeal, plaintiffs are lamenting the loss of this side channel for the two- to three-year period. But the point is that the bypass channel, the construction of this project, on this record, the Fish and Wildlife Service specifically concluded that it will substantially increase the likelihood of survival and recovery of this species. Now, I understand plaintiffs want an open rear weir, an open river with no weir. And I understand that they think that more fish will pass. And guess what? The agencies found the same thing. They recognized that. They said, yes, in fact, if it were an open river, more fish would pass. But it's important to focus on what the purpose of this is. This just reminded us that we're supposed to see if the judge identified the correct law. Right. Apparently did. He identified the Endangered Species Act, the Clean Water Act, the EPA, NEPA, and applied it. Probably wrong in your view. Why? This is one of those preliminary injunctions where it strikes me there's probably nothing left to try. But just assume that it's a preliminary injunction. Why did he abuse his discretion? Right. So we talk about this in our briefing. And I think it's important to recognize that any challenge under the Endangered Species Act, under NEPA, and under the Clean Water Act, the district court, and we say this in our briefs, both in our opening brief and in our reply brief, the district court is bound to apply the substantial deference standard of the APA. So what you have in this case is you have a district court that said that plaintiffs, based on their arguments, have demonstrated a substantial likelihood of success on the merits of their claims. And we say this in our briefing. The district court failed to apply the deference that is owed to agencies' decisions. And we talk about how the district court and plaintiffs substitute their judgment for that of expert agencies in this case. And that's legal error. What harm will befall the government or the or your colleague here if the status quo remains until the trial? The status quo, we're talking about harm to the fish, Your Honor. So I think we're You're not the fish. I'm talking about No, no. I'm talking about the government and the irrigation district. If the status quo remains in effect while the case is tried, what harm will befall your side of the So to be clear, summary judgment motions and all the briefing has been submitted, the district court has scheduled a summary judgment Right. Maybe there won't be a trial. So I'm asking between now and the time that the district court disposes of the case in its entirety, what harm will befall you represent the United States? That's correct. What harm will befall the United States as a result of the preliminary injunction? We are enjoined from proceeding with a project that unequivocally will improve the situation for these endangered fish. And the government, the agencies have cooperated with both intervenors. They've cooperated with other advocacy organizations in Montana seeking to find a way to improve the situation for these fish. But that's an argument that you've done nothing wrong. And I understand that argument. I'm really here trying to figure out whether the district judge balanced the – let me finish. Whether the district judge balanced the equities. And the question is, what equity is on your side in the terms of the preliminary injunction? Right. So we point out this in our brief. I'm going to ask the same question to them because it seems to me fish will die while the preliminary injunction is in effect or not in effect. But from your side, what's the harm? Right. So we talk about this in our brief, Your Honor. We talk about the Endangered Species Act. The Endangered Species Act, clearly Congress sought to protect endangered species. That's what the federal agencies are doing here. And to your point, I think that the reason why we're here, the reason why the government appealed this preliminary injunction is because the district court erred and abused its discretion below when it entered this injunction. And because this is a situation that's unique, where the government is seeking to help the species, allowing this decision to stand, you're going to create a whole new class of it's not good enough litigation. And that cannot be right. It cannot be right that plaintiffs get to come into federal court, seek an injunction to prevent agencies from improving the situation for these endangered fish. Thank you. Bill, you're on the other side. Oh, sorry. Yes, Bill. You should hear the irrigation. Irrigators. May it please the Court, Mark Sturmitz representing the intervener defendants, the Lower Yellowstone River Irrigation Project et al. Going to the point that Judge Hurwitz made about the harm that would occur if the injunction just remained in place, the very real consequence of that is this is a Bureau of Reclamation facility, and the project is being funded with Corps of Engineers funds or funds that are going through the Corps of Engineers. Those funds will not remain available. Yes. If the weir is built as the government wants to, is your client better off? If the project is allowed to go forward? Yes. In constructed areas? Yes. Why? Because we will have ensured that the irrigation water is still available. It's available now. And we will have, hopefully, if the project works as people anticipate, allowed the recovery of this fish to improve. Now, I'm asking about your client gets water from this facility, correct? Yes, Your Honor. Will your client get less water from this facility under the injunction? No. So from your client's perspective, it doesn't really matter whether there's an injunction. It does, Your Honor, because we care about the fish, too. Everybody cares about the fish. We've been at the table trying to get this issue resolved. But I'm focusing now on your client's at least commercial interest. Other than your client's general interest in the health of the fish, is it harmed at all by the preliminary injunction? No. That's the irony. The status quo for you in terms of water is what you like. It's what's been going on for 100 years. I just wanted to understand that. And I was going to say this case was truly extraordinary, but I decided not to. It may well be. It may well be. It may just be a case laid on truly extraordinary. The only other thing I'm going to say, because I do want to leave the remainder for the government, is that as far as the court's application of the law is concerned, there are some fairly standard reviews here that weren't done properly. And the one that I think jumps out the most is that the harms are not tied to the action that's on the table. I mean, the action that's on the table is this recovery project, not the existence of the weir itself. And the judge conflated all the existing problems that everybody admits are caused by this weir and have been for 100-plus years with the project that's being reviewed. And that cannot be right. Thank you. Thank you, Your Honor. Thank you. May it please the Court, Neil Levine on behalf of the plaintiffs in this case. I want to focus first on the district court's finding of irreparable harm. And while the government has touted the idea that this project is designed to improve it, the court just ultimately looked at the facts of the case, looked at the evidence presented to the court, and concluded that the evidence did not support the notion that this is an improvement. Well, just a minute. Let me see what they did. Why did the district court take into account the present harm? The court did. And when I looked at the district court decision, all of a sudden what's happening now had a difference in what the district court was going to do. The court considered the difference between the status quo and the proposed project. Well, no, it didn't. It said the status quos or the present harm now is a part of the harm the government wants to impose. It seems to me that what's happened to this point has happened, and it's going to continue to happen. What the district court should have focused on is what will the new project do? What irreparable harm will the new project do? Well, the district court said that just like the old existing structure, the new one is going to block the river. It's going to make things worse? It's going to make things worse because now ‑‑ No, no. You began by saying the district court erred in concluding that it didn't make things better. No, I didn't say that, Your Honor. So how will it make things worse? Well, two things. One is the court said that the existing structure erodes every year, requiring rocking or the placement of rocks on top of the weir. Now we're going to have a permanent concrete structure in the middle of the river. Second, they're going to destroy the existing side channel. While we can quibble about how good of a side channel it is, it's going to be destroyed immediately upon construction of the project. And third, the court considered ‑‑ We did say things about the side channel. Well, I'm trying to figure out because it doesn't seem to me when looking at what happened in front of the district court that this side channel argument even came up. Oh, it most definitely came up because that's the entirety of the government's argument. They're relying on what they're contending is a better ‑‑ My worry about this is that I got the idea that you agree the fish cannot get through the weir as it presently is. In 2014 and 15, there's evidence that some fish ‑‑ In 2014, a few fish passed through this side channel. That's it. That's the best evidence we got. Correct, Your Honor. And frankly, other than that, no fish get through. That's right, Your Honor. So based on what we have now, we have two years where a few fish got through. And under the new, supposed new idea that the government has now suggested should happen, there's all kinds of fish that are going to get through. Well, the evidence doesn't support that. Well, just a minute. Where doesn't it? Looking at what the U.S. Army Corps of Engineers put together, where is the evidence that's wrong? Okay. Well, first of all, we're talking about irreparable harm. And I just want to reiterate that I think that the abuse of discretion standard requires the court to defer and conduct a limited review of the district court. Well, I'm going to give the court the abuse of discretion standard, but I can't find that the fish get through at all now. I got a few fish in 2014 and 2015. I'm not sure you told the district court that. But even given that, at this point, there's nothing helping the fish. And now the government has put together something that will help the fish, and you don't like it. I appreciate you want to take out the we're all together, but you're not here for that. We can't do that. Let me cite the court to excerpts of record 1226, which is the Fish and Wildlife Service's biological opinion. And that reads that there – well, let me just summarize it. It says that we don't know if this new side channel is going to work. And I'll quote the – No, I agree. I agree it's speculative whether things will get better. The question is what's the evidence that things will get worse? In other words, what – let me ask the same question I asked your colleague. Could the government today say, you know, these defenders of wildlife people are pesky and they make a good point? The heck with it. The Irrigation District is perfectly happy with the water it's getting now. We'll spend our money someplace else. That would not be – you would have no legal recourse under those circumstances, would you? Well, a couple things, Your Honor. The Service and the Bureau of Reclamation have been attempting to consult under the Endangered Species Act. No, that wasn't the question I asked. Let me – I'm asking a question. If they did nothing, if they said today, you're right, we're going to abandon this project entirely, we're going to leave the status quo in effect, would any of the acts that you cite today prevent them from doing that? The Endangered Species Act would because annual – the annual maintenance activity of placing rocks on top of the dam is an agency action that requires ESA consultation. And you could challenge that, I suppose. And we can challenge that. And that happens every year. And just because of that, the Service and the Reclamation have been trying to go through a consultation process since, I believe, it's 1993. The species was listed in 1990. And the problems just hamstrung both agencies to do nothing. And it was only after this lawsuit was filed that the biological opinion and this whole process got to a point where we have a new decision on the proposed action. But I take it your position in this case is that there's a third option, and that's the one they should choose, correct? That may be, yes, Your Honor. And you're probably right. They should choose it. But are they required to choose it under any of these acts? They're not required to choose, but at least under the Clean Water Act, which is one of our claims that the district court ruled in our favor on, they are prohibited from approving the proposed project, not necessarily choosing the one that we prefer, but prohibited from approving the proposed project because they did not go through the proper analysis under the Clean Water Act. The analysis I take it would be whether they were jeopardizing the ecosystem. No, Your Honor. This is under the Clean Water Act. Right. So what would the analysis under the Clean Water Act require? The analysis is two parts. It's under Section 230.10a of the Clean Water Act regulations, and that requires the agency to first choose the least environmentally damaging alternative, or identify it, rather. And it was identified here because everybody knows the least damaging alternative is the one you like. It is, but the analysis that the Army Corps did under the Clean Water Act doesn't actually identify it, but putting that aside for a moment. But the second point is that the agency is required to prove that that alternative is not practicable, and they were unable to do that. But isn't there ample evidence in this record that it's not practicable because it would be very expensive and would also harm the ability to deliver water, which is the primary job of this jail? No, Your Honor. The government concluded that, in fact, while it may be more expensive, it is still practicable under the appropriate standards. And I believe if you look at the EIS at Executive Record 1432, there's a chart on that page. And the chart on that page identifies whether or not the proposed action and the proposed or one of the alternatives, the multiple pump alternative, both improve fish passage and are viable in terms of economics. Yeah, maybe we're looking at different parts of the record, but I'm looking at ER 2148, where the Army Corps finds that the pumping alternatives were cost-prohibitive and not practicable. You told me they found that they were practicable. Which alternatives they found practicable? The pumping. The alternative that you favor is the pumping alternative. Again, if you look at ER 1432, I understand that there's a conclusory statement at the end of the Clean Water Act analysis. But when they actually lay out the test and ask the question whether or not the existing lower Yellowstone project will remain, quote, viable and effective, the answer is yes. Oh, no, the water project will remain viable and effective. Both projects, Your Honor. The question is whether or not this is a practicable solution. And the Corps of Engineers, which may be wrong, did make that determination. It's on page 2148 of the record. They said it is cost-prohibitive and not practicable. Right, but cost-prohibitive is not the test. The question is, is the — And practicable cost-prohibitive is not a test? No, it's whether or not it is practicable. And as the district court found in reviewing the record, the agency said — So no matter how expensive, as long as it can be done, that it's practicable? That's not my opinion, Your Honor. That's the agency's — No, the agency's opinion is that it's not practicable. So I'm trying to figure out what's wrong with the agency's opinion. Part of the reason they find it not practicable is they say it will cost a heck of a lot of money. And is it your position that money is not a relevant consideration? No, absolutely not, Your Honor. And that's not what the record says. The record says that — Take a look at 2148. Isn't that what they say? They said on that page that — let me point the Court, though, to what the district court looked at in reviewing this issue. Well, maybe you could answer Judge Hurwitz's question. He cited you to — Yeah. It may be they were wrong. It may be that the district court correctly ruled against them. But you said what they would have been required to do under the Clean Water Act is make a finding of nonpracticability. And I see that finding in the record. It may not be supported. There may be all kinds of reasons that there's something wrong with it. But isn't there an explicit finding of nonpracticability? It says that the proposed action is the most cost-effective action. The proposed alternative is the most cost-effective, constructible, practicable, and sustainable with a higher likelihood of success. Do they need to make — assuming that's supported by the record, which it may not be, do they need to say more than that? That's not the question. As the Utah case out of the Tenth Circuit says, the question is whether or not the multiple pump alternative, not the proposed action, the multiple pump alternative, is practicable or not, because that's the least damaging one. And so the agency's analysis is not supposed to focus on whether or not the proposed project is practicable, but the least damaging environmental alternative is. But it seems to me that what the agent of the court said was that the bypass channel project was the least environmentally harmful, practicable option. Well, that's blurring the test, Your Honor. Pardon me? That's blurring the test. Well, it may be blurring the test, but it seems to me that what the agency had to do was come up with something which was environmentally the best, environmentally the least harmful, and as well, practicable. And as I read their message, it was that the bypass channel was the least environmentally harmful and practicable option. Right, but that's not what the — I guess going back — If that's so, how do I go around? What's my standard of review on that? Well, I guess my argument to you would be — What's my standard of review? My argument to you would be, under the abuse of discretion standard, is this the district court got the law right? And the district court did. Well, I'm worried about what the district court did, because the district court either didn't even look at this or they were saying that it was arbitrary and capricious in light of a single statement that all options were potentially practicable. Now, my book is, that doesn't cut it. That means the district court missed on the Clean Water Act. Respectfully, Your Honor, if I could cite the court to 305 F. 3rd at 1189, which is this Utahn's case out of the Tenth Circuit, it reads, The test is not whether the proposed project is better than an alternative with less wetland impacts. The test is whether the alternative with less wetland impacts is impracticable. But this — So you — I understand your argument. Okay. I understand your argument. Thank you, Your Honor. So let's — well, I want to go back to the non-Clean Water Act claims for a second. And I'll be looking at the definition of jeopardize in the regs, which is at 50 CFR section 402.02. And it talks — jeopardize means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of the survival and recovery of a species. Why does this action that they want to take, the smaller weir, in effect, jeopardize the continued existence of the species? Your Honor, that — I understand where the Court's coming from. But that is not the issue on appeal. The issue on appeal is what the district court found was an inadequate analysis. Okay. I understand your argument on that point, and I appreciate it. I'd also appreciate your directing your answer to my question. If this is important and you say it's not, do you agree that the action doesn't jeopardize the continued existence of the species in the — in the terms that this regulation speaks to? Well, again, Your Honor, the district court — the idea that this is — I have a lot of appreciation for the district judge. Right. He did a terrific job. With all respect, I just want an answer to my question. The reg says jeopardize means that reasonably would be expected to reduce appreciably the likelihood of the survival and recovery of the species. So tell me how this proposed action does that. It may be that it doesn't have to for you to win. It may have been that the district court thought there was an inadequate consultation. But at least on the substantive level, I want to know the answer to that question. Because this is a new project. This is a new project where instead of an eroding rock and wood weir, you're going to have a concrete dam permanently put into the river. So does this record support the notion that compared to the status quo with the eroding dam, the new dam will make things worse? Well, you're going to have a concrete dam instead of an eroding dam. And second — Tell me — tell me — I'm, again, asking a specific question. Does the record support the conclusion that the new dam will make things worse? And if so, where can I find that in the record? The record doesn't support that it will improve. It does. I agree. Maybe it doesn't. Maybe it doesn't. But I'll accept that for a moment. I asked a different question, though, and I'm still — you don't want to answer it, and I understand why. But does the record support the conclusion that the dam will make things worse for the fish? There's uncertainty. The whole concept of improvement or making it better — I'm not asking about improvement. I'm asking about making things worse. Well, right now, you have a side channel that works some of the time. Under the proposed action, you are obliterating that side channel. But opening up a broader channel. You're making a new channel that has characteristics that the service even says. And I know they say repeatedly this is going to improve, improve, improve. No, I'll take it — again, we're arguing past each other here, so I just want to — It may be that it won't make things better. Can I conclude on this record that it will make things worse? It'll make things worse, in my opinion, because you are closing a side channel that does work some of the time. So for two years, you will be closing a side channel that occasionally works? Correct. Coupled with it'll make things worse because whereas we know that the side channel that exists today works some of the time, the scientists don't know whether the new side channel will work at all. Okay. So that's the jeopardy that you — that's the only jeopardy that you can identify in this record, right? Yes. And just to be clear, our argument was not that this will cause jeopardy, but that the analysis was inadequate. Well, but analysis is only required when jeopardy, under several of the acts, when an action will cause jeopardy, right? No, it's a much lower standard to trigger the analysis. The analysis is triggered if there is a may effect to the species. Each Federal agency shall carry out consultation to make sure it's not likely to jeopardize. Right. So that's the test that they apply once they get into the consultation process. Right. So if you started out with the notion that it won't — let's assume we all agreed it wouldn't make anything worse, then the agency would not then be required to engage in consultation, would it? I would not agree with that, Your Honor, because even beneficial actions — I mean, I know you won't agree with that. Well, I just — the regulations talk about that any impact to an endangered species triggers the consultation process. The outcome of that process — Right. So, okay, I worded it wrong. If we all agreed in advance that there was no impact on an endangered species from a governmental action, consultation would not be required. True. But even here, in the incidental take statement, the service says, even with this side channel, you're still going to be taking 59 percent of the fish that reach that place. So help me on that one, because that's what — I'm interested in that, too. So your notion is that because there's a take as an instance of this action, even assuming for the moment that it doesn't make things worse, it nonetheless triggers the entire consultation process. It does. And this is the issue where the service was required — the district court said that the service is required to conduct this analysis to whether the species could even withstand the loss of 59 percent going forward, and there was no analysis found in the record on this point. And to be fair, they did consult. You just think the consultation process was insufficient. Correct. If there's any other questions, I'll sit down now. No. Thank you. Thank you, Your Honors. Thank you for your argument. I just want to be clear about the Clean Water Act specifically, and I'll point the Court's attention. Judge Hurwitz, you're absolutely right to look at 2148, but also — And so I was looking at it, and your colleague educated me and said all that the agency found  there was that the alternative you've chosen was the most practicable. And is that enough? So I'm going to tell you to flip two pages, go to 2150, and there's a question, and this 2150 summarizes all of the findings that the Court reached in its Clean Water Act analysis. And the finding asked specifically, and I'm quoting, are there any available practicable alternatives having less adverse impact on the aquatic ecosystem? The Court answered that question, no. We point out in our opening brief, as well as our reply brief from pages 29 to 31, why that is accurate with the rest of the record in this case. And so I want to — So that's the box to get checked. Yeah, it gets checked. But that is consistent with everything else that the Court found. And so as to the least environmentally damaging, we point this out in our reply brief. Just because their preferred alternative, the open river, allows more fish to pass, that does not make it, for purposes of a Clean Water Act, the least environmentally damaging. And the Corps specifically pointed out that every single alternative, save for the no-action alternative, all of them involved excavation, all of them involved grading. Their preferred option, the multiple pumps, have to construct new roads, have to dig into the river itself, have to pour concrete, have to be maintained. There's lots of reasons why the Corps might find, I think, the proposed action impracticable or not practicable. Correct. I'm looking, other than checking the box, is there some place in the record where they actually make that point? Right. So we talk about this in our reply brief. I provide a whole bunch of citations. But you're absolutely right, Your Honor. Under the right — Well, so, okay, give me — Practicality. Give me your best citation so I can find it.  Sure. Start at my reply brief at page 26 and keep reading until you get to 31. Under costs, excerpt of record 1435, it talks about the exact cost, 57 million for the bypass channel, 132 million for the preferred that the plaintiffs come in with. A practical alternative takes into consideration cost, technology, and the purposes of the project. And this is important because — Okay. Let me just — let me make sure we're saying the same thing. The Court made lots of findings from which I could conclude that the — that the proposed alternative, the pumping, if you will, was not practicable. Yes. But I'm trying to look for them making that conclusion other than checking the box. Is there some place in the record other than that where they say it's not practicable because? Yes, Your Honor, yes. And I'm trying to read them to you as — And what you're reading to me are places where they say it costs a lot of money. It costs a lot of money and purposes of the project. I know. Those are things that would support a finding of non-practicability. Correct. I'm asking — you're answering a different question than the one I'm asking. Other than checking the box — Yes. Is there any place where they say this is impracticable? Okay. So let's back up. Let's back up. They rely — Step back and listen to his question. Step back and listen to his question. I'm listening to it, Your Honor. And what I'm trying to say is they're relying on a Tenth Circuit decision. We are in the Ninth Circuit. I'm not asking — Now, please. I understand you're — No. There is no specific line in the record. It may not make a difference, but just answer my question. No. But there's plenty of opportunity throughout this record where they specifically raise all these substantial concerns throughout this record. And that's my point, Your Honor. When you look at this record, when you look at the purpose, when you look at the consideration of feasibility, when you look at the consideration of cost, all those point to and support the check-the-box claim. Okay. And I understand that argument. And you — and it's a terrific argument. You may well prevail on it. Thank you, Your Honor. All I was trying to find out, which — and we could have gotten there much quicker is was there any place else in the record where they said that? The line that they're looking for according to the — they're reading the Tenth Circuit's case, no. The answer is no. Let me just touch on a few things. They're talking about this side channel. Plaintiffs and page 11 of their brief, for 60 years the fish that have passed in the existing side channel, they themselves say there's been no recruitment. So to somehow suggest that allowing the side channel to continue is going to help the species, it will not. This case, we talk about the rocking. They are not challenging the rocking. That's not an agency action that's at issue here. This is appeal of a preliminary injunction. The district court concluded that they have established irreparable harm. In our briefing, we prove that that's erroneous. They talk about establishing a likelihood of success on the merits of their claims. When properly applied, the deferential standard of review favors the agencies here. And we ask that you vacate the preliminary injunction motion, order that was granted by the district court. Thank you. We appreciate both sides' arguments. Thank you very much. And case 1735712 and 35713, those cases are both submitted. And court is adjourned for today. Thank you very much.
judges: N.R. Smith, Hurwitz, Curiel